UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> RONALD SMITH, <br><br> Defendant. | COMPLAINT <br><br> JURY TRIAL DEMANDED <br> CASE NO. 1:26-cv-02582 |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendant Ronald Smith ("Smith"), alleges as follows:

## SUMMARY

1.     This action concerns Smith's insider trading in the securities of two issuers based on material nonpublic information Smith received from his close friend and colleague, Jordan Meadow ("Meadow"), who was in possession of material nonpublic information received from his friends, Steven Teixeira ("Teixeira") and Individual 1.[1]

2.     Smith and Meadow were at all relevant times registered representatives at a New York-based registered broker dealer (the "Brokerage Firm").

3.     Teixeira lived and had a romantic relationship with an executive assistant (the "Executive Assistant") who worked at a New York-based investment bank (the "Investment Bank") during the relevant period.

---

[1] On June 29, 2023, the Commission filed an action against Meadow and Teixeira for their roles in the insider trading scheme, *SEC v. Meadow, et. al.*, Case No. 23-cv-05573 (S.D.N.Y.), which is presently stayed pending the resolution of the parallel criminal proceeding against Meadow, *United States v. Meadow*, 23-cr-313 (S.D.N.Y.).

4.      Because of her role at the Investment Bank, the Executive Assistant had access to material nonpublic information relating to mergers and acquisitions involving the Investment Bank's clients.  The Executive Assistant had access to this information on her laptop computer, which she left unattended in the apartment she shared with Teixeira.

5.      From in or about late 2020 through in or about May 2022, Teixeira misappropriated material nonpublic information from the Executive Assistant's laptop.

6.      The material nonpublic information related to the securities of Domtar Corporation ("Domtar"), CDK Global, Inc. ("CDK"), Score Media and Gaming, Inc. ("Score") and VMWare, Inc. ("VMWare"), among others.

7.      Teixeira shared the material nonpublic information that he misappropriated concerning Domtar and CDK with Individual 1 and Meadow, among others. Teixeira also shared the material nonpublic information that he misappropriated concerning Score and VMWare with Individual 1, who then shared it with Meadow.

8.      Meadow traded securities based on the material nonpublic information that he obtained from Teixeira and Individual 1 and shared the information, including that the information had been misappropriated, with his friend and co-worker, Smith.

9.      Smith profitably traded securities of Score and VMWare based on the material nonpublic information that he received from Meadow and knew that the information had been obtained in breach of a duty or misappropriated.

10.     Meadow and Smith also used the misappropriated information to recommend profitable trades to their shared customers at the Brokerage Firm, for which they received commissions.

11.     Smith also had access to the brokerage account of his then girlfriend and now wife, Individual 2, and caused trades to be placed in that account with the material nonpublic information.

12.     In exchange for the material nonpublic information, Meadow offered to compensate Teixeira and Individual 1, including discussing providing them with Rolex watches. Meadow and Smith discussed compensating Teixeira and Individual 1 in exchange for material nonpublic information.

13.     Smith's illicit profits from trading based on the information he received from Meadow totaled more than $530,000 in his own account and more than $25,000 in Individual 2's account.

14.     Together, customers of Meadow and Smith made millions of dollars on timely trades in the securities of Score, while Meadow and Smith also made hundreds of thousands more in commissions.

## **VIOLATIONS**

15.     Defendant violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by engaging in the conduct this Complaint describes.

16.     Defendant will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object, unless he is restrained and enjoined.

## **NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

17.     The Commission brings this action pursuant to Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)], 21(e) [15 U.S.C. § 78u(e)] and 21A(a) [15 U.S.C. § 78u-1(a)].

18.    The Commission seeks a final judgment (a) permanently enjoining and restraining Smith from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (b) permanently enjoining and restraining Smith from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser pursuant to Section 21(d)(1) and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (5)]; (c) ordering Smith to disgorge ill-gotten gains he received as a result of the violations this Complaint alleges, and to pay prejudgment interest pursuant to Exchange Act Sections 21(d)(3), (5) and (7) [15 U.S.C. §§ 78u(d)(3), (5) and (7)]; (d) ordering Smith to pay civil penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-l]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e) and 78aa].

20.    Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  During the relevant time period, Smith worked at the New York office of the Brokerage Firm, which is located in this District.  Defendant also may be found or transacts business in the Southern District of New York, and certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of New York.

## DEFENDANT

21.    **Ronald Smith**, age 37, lives in Stamford, Connecticut.  He served as a registered representative of the Brokerage Firm since in or about July 2013 through December 2023.

4

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

22.    **Jordan Meadow** served as a registered representative of the Brokerage Firm from in or about 2018 through June 2023.

23.    **Steven Teixeira** was, at relevant times, employed by an international payment processing company as its Chief Compliance Officer and was a certified anti-money laundering specialist.

24.    **Executive Assistant** was, at relevant times, employed by the Investment Bank as an executive assistant.  At the Investment Bank, the Executive Assistant was responsible for, among other things, scheduling meetings of the Investment Bank's valuation and fairness committees concerning potential transactions involving the Investment Bank's clients.  The Executive Assistant had access to material nonpublic information relating to dozens of the Investment Bank's deals.

25.    **Individual 1** was at relevant times a friend of Teixeira and Meadow.

26.    **Individual 2** was at relevant times the romantic partner and now wife of Smith. Smith had access to Individual 2's brokerage account.

27.    **Investment Bank** is a U.S.-based investment bank and financial services company headquartered in New York, within the Southern District of New York.

28.    **Brokerage Firm** is a U.S.-based brokerage firm with offices in New York, within the Southern District of New York.

## COMMONLY USED TRADING TERMS

29.    A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price)

5

prior to the expiration date.  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

30.    A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at a specified strike price within a specific period of time.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase during that period of time.

## FACTS

**I.    Teixeira Accessed the Investment Bank's Material Nonpublic Information**

31.    The Executive Assistant worked for the Investment Bank from in or about 2014 through in or about February 2023.

32.    The Executive Assistant had two primary responsibilities at the Investment Bank.  First, she supported several investment bankers.  Second, she was responsible for scheduling valuation and fairness committee meetings for the Investment Bank.  These meetings related to confidential potential transactions involving the Investment Bank's clients, including potential mergers and acquisitions of publicly traded companies.

33.    Several bankers whom the Executive Assistant supported shared their Microsoft Outlook calendars with her.  The bankers' calendar items were thus visible within the Executive Assistant's Outlook.  Accordingly, anyone with access to the Executive Assistant's Outlook account would also have access to the calendars and calendar items of these bankers.

34.    Deal teams working on transactions provided the Executive Assistant with scheduling request forms for valuation and fairness committee meetings.  These forms included the names of the companies participating in, and the material terms relating to, the proposed

6

deals.  The Executive Assistant created and sent calendar invitations for the meetings, attaching the scheduling request forms to the invitations.

35.     The Executive Assistant lived at relevant times in an apartment in Queens, New York that she shared with Teixeira.

36.     The Executive Assistant and Teixeira shared confidences, including about their relationship, their families, and their work and careers. The Executive Assistant trusted Teixeira to maintain those confidences, and Teixeira knew that the Executive Assistant expected him to keep the information confidential.

37.     The Executive Assistant worked from the Queens, New York apartment she shared with Teixeira starting in or about July 2020 and continuing into 2021.  The Executive Assistant accessed her work files and the Investment Bank's Outlook application from home by logging into the Investment Bank's computer system via her personal laptop.

38.     The Investment Bank's online portal for employees working remotely locked automatically after a period of inactivity.  The system could detect that an employee was not typing or moving their mouse, for example, and would require the employee to log in again to access the Investment Bank's files.

39.     The Executive Assistant often left the apartment she shared with Teixeira during the workday or otherwise left her laptop unattended.

40.     Teixeira was familiar with the Executive Assistant's work-from-home routine.  In particular, Teixeira was aware that the Executive Assistant left her laptop unattended at their apartment during the workday.

41.     Teixeira provided the Executive Assistant with a device that moved the Executive Assistant's mouse while she was away from her computer.  This device simulated user activity

and prevented the Investment Bank's online portal from detecting that the Executive Assistant was away from her computer, which would otherwise cause the system to lock and require the Executive Assistant to log in to access the Investment Bank's files.

42.     The Executive Assistant asked Teixeira to check her work email while she was away during the workday, and to alert her if she received emails that required her attention.

43.     In providing Teixeira access to her laptop and work applications, the Executive Assistant trusted Teixeira not to access or misappropriate the Investment Bank's confidential information for his own benefit.

## II.     Teixeira Misappropriated the Investment Bank's Material Nonpublic Information and Shared It With Others

44.     In or about late 2020, Teixeira began misappropriating the Investment Bank's confidential information from the Executive Assistant's laptop for his own benefit.

45.     Teixeira accessed the Executive Assistant's laptop while she was away—either out of the room or away from the apartment entirely.  Using his access, Teixeira reviewed the Executive Assistant's Outlook application to find valuation and fairness committee meetings relating to mergers and acquisitions of public companies.  He then reviewed the attachments containing the party names and material terms of potential transactions involving the Investment Bank's clients.

46.     Teixeira told others, including Individual 1 and Meadow, that he had access to material nonpublic information through his access to the Executive Assistant's laptop.  He told them that he did not have the Executive Assistant's permission to take the Investment Bank's information and urged those who knew her not to tell the Executive Assistant about what Teixeira was doing with that information.

47.     Teixeira shared material nonpublic information that he obtained from the Executive Assistant's laptop with Individual 1, Meadow, and others so that they could trade on the basis of the information.

### III.     Meadow Obtained the Investment Bank's Misappropriated Material Nonpublic Information From Teixeira and Individual 1 and Shared It With Smith

48.     Teixeira and Individual 1 discussed sharing the Investment Bank's material nonpublic information that Teixeira was obtaining from Executive Assistant's laptop with Meadow because Meadow worked in the securities industry and might compensate Teixeira and Individual 1 for providing him with the material nonpublic information Teixeira obtained.

49.     In or about March 2021, Teixeira, Meadow, and Individual 1 drove together from New York to Hoboken, New Jersey.

50.     The three of them discussed their insider-trading scheme during their drive.

51.     Teixeira explained during the drive that he was in a romantic relationship with the Executive Assistant and that the Executive Assistant worked for the Investment Bank.

52.     Teixeira also told Meadow during the drive that Teixeira could obtain the Investment Bank's confidential merger and acquisition information regarding public companies by accessing the Executive Assistant's laptop, without the Executive Assistant's knowledge, when she left it unattended in their apartment.

53.     As noted above, Teixeira explained to Meadow that he did not have the Executive Assistant's permission to take the Investment Bank's information or to share that information with others.

54.     Teixeira further provided Meadow with material nonpublic information about potential transactions involving Domtar and CDK that he had surreptitiously obtained from the Executive Assistant's laptop.

55.     Meadow then discussed the material nonpublic information he obtained from Teixeira and Individual 1 about Domtar and CDK with Smith, including that Teixeira misappropriated the information from the Executive Assistant.

56.     Around this time, Meadow agreed to compensate Teixeira and Individual 1 for providing him with the Investment Bank's material nonpublic information by buying Teixeira and Individual 1 Rolex watches.  Meadow and Smith also discussed compensating Teixeira and Individual 1 in exchange for the material nonpublic information.

57.     The Domtar transaction that Teixeira had tipped Meadow about in March 2021 was publicly announced in May 2021 confirming the accuracy and value of Teixeira's information.  Following the announcement, Meadow texted Teixeira seeking additional material nonpublic information that he could trade on.

IV.     **Meadow Shares Material Nonpublic Information About Score with Smith**

58.     During the relevant period, Smith and Meadow shared an office at the Brokerage Firm's headquarters in Manhattan where they worked side by side when both were in the office. They also texted each other on a near-daily basis about personal matters as well as work.

59.     On occasion, Smith accessed Individual 2's brokerage account while in his shared office with Meadow.

60.     Smith and Meadow had their own brokerage customers, as well as shared customers of the Brokerage Firm, for which they split commissions equally.

61.     At relevant times, Score traded on the Toronto Stock Exchange and the NASDAQ Stock Market under the ticker symbol "SCR."

62.     On or about July 23, 2021, the Executive Assistant received a request to schedule a valuation committee meeting relating to Penn Entertainment's interest in acquiring Score for

10

$36 per share, with an expected announcement date of August 5, 2021.  At the time, Score was trading at about $15 per share.

63.    The Executive Assistant sent a calendar invitation for the meeting on July 26, 2021, attaching a scheduling request form containing the expected announcement date and value of the deal.

64.    Teixeira accessed this material nonpublic information from the Executive Assistant's laptop without her or the Investment Bank's permission to do so, and shared it with others, including Individual 1.

65.    In one or more communications on or after July 26, 2021, Individual 1 shared this material nonpublic information regarding the Score transaction with Meadow.

66.    During the morning of July 30, 2021, Teixeira and Individual 1 spoke on the phone for approximately 38 minutes while the Executive Assistant was away from the apartment she shared with Teixeira.

67.    Shortly after getting off the phone with Teixeira, Individual 1 talked on the phone with Meadow for about 10 minutes.

68.    The same day, Meadow's brokerage customers began purchasing Score stock based on Meadow's recommendation.

69.    Following Meadow's conversations with Individual 1 about Score, Meadow and Smith discussed Score in one or more communications, including discussions about recommending that their shared brokerage customers purchase Score stock.

70.    For example, on Sunday, August 1, 2021, Meadow and Smith spoke on the phone for approximately 19 minutes.

11

71.    While they were speaking on the phone, Smith accessed information about Score on a website for researching and discussing US-traded securities.

72.    The next day, Monday, August 2, 2021, Smith used the same website to search for information regarding Penn Entertainment.

## V.    Smith's Insider Trading in Score Securities

73.    On August 2, 2021, Smith purchased 500 Score call option contracts with an expiration date of August 20, 2021 and a strike price of $20 ("Score August 20, 2021 $20 call options") in his brokerage account. Score's stock price closed at $17.55 per share that day. Smith's purchases on August 2 accounted for approximately 60% of the volume of the Score August 20, 2021 $20 call options that day.

74.    Later on August 2, 2021, following another call with Smith, Meadow purchased 112 Score call option contracts with a strike price of $20 and an expiration date of September 17, 2021, along with 489 Score call option contracts with a strike price of $22.50 and an expiration date of August 20, 2021.

75.    Meadow continued his purchases on August 3, 2021.  That day, he purchased 218 additional Score August 20, 2021 $20 call options.

76.    On the afternoon of August 2, 2021, the brokerage account of Smith's then romantic partner and now wife, Individual 2, was accessed from the same IP address that Smith used earlier that day to access his own account and to search for information regarding Score and Penn Entertainment.  Smith caused the brokerage account of Individual 2 to purchase 100 shares of Score stock.

77.    On August 3, 2021, Smith caused Individual 2's brokerage account to purchase 40 Score call option contracts with an expiration date of September 17, 2021 and a strike price of

$25 ("Score September 17, 2021 $25 call options"). The closing price of Score stock on August 3 was $17.36 per share.

78.    On August 4, 2021, while Meadow and Smith were both in their shared office at the Brokerage Firm, Smith sold 30 of his Score August 20, 2021 $20 call options.

79.    As of the close of business on August 4, 2021, Smith held in his own account 470 Score August 20, 2021 $20 call options, and Individual 2's account held another 40 Score September 17, 2021 $25 call options and 100 shares of Score stock.

80.    Additionally, starting on July 30, 2021 and continuing through August 4, Meadow and then Smith recommended to certain of their brokerage customers that they purchase Score stock.

81.    By the close of business on August 4, approximately 60 brokerage customers of Meadow and Smith had purchased a combined total of over 300,000 shares of Score stock at a cost of over $6 million. Of these brokerage customers, eight were Smith's customers and another 41 were customers he shared with Meadow, who purchased approximately 245,000 shares of Score stock, spending nearly $4.6 million.

82.    On August 5, 2021, before the markets opened, Penn Entertainment and Score announced that they had entered into an agreement whereby Penn Entertainment would acquire Score for approximately $2 billion in cash and stock. That day, Score's stock opened at $29.55 per share, rose to $33.22 per share, and closed at $32.64 per share, a nearly 80% increase from the prior day's closing price.

83.    On the morning of August 5, 2021, from his office at the Brokerage Firm, Smith sold all the Score call option contracts in his and Individual 2's brokerage accounts. The next day, August 6, Smith caused the Score stock in Individual 2's account to be sold as well.

13

84.     Smith realized profits of over $484,000 trading Score securities in his brokerage account, in addition to over $15,700 in Individual 2's brokerage account, for a total of almost $500,000 in illicit profits.

85.     Meadow also sold his Score call options, realizing $637,491 in illicit profits.

86.     In addition, based on Smith's recommendation, Smith's brokerage customers made approximately $225,000 in profits trading Score stock, while Smith made commissions of approximately $20,600 on those trades.  Meadow and Smith's shared customers made another $5 million in profits trading Score stock, while those trades generated approximately hundreds of thousands of dollars in commissions that Smith and Meadow split.

## VI.     Smith's Insider Trading in VMWare Securities

87.     At relevant times, VMWare traded on the New York Stock Exchange under the ticker symbol "VMW."

88.     In or about late 2021, a technology company ("Company A") engaged the Investment Bank regarding Company A's interest in acquiring VMWare for more than $60 billion.  At the time, VMWare's market cap was approximately $50 billion.  The Investment Bank held a valuation committee meeting regarding this transaction in January 2022.

89.     Although the Executive Assistant did not send out the calendar invitation for the meeting, bankers that the Executive Assistant supported were invited to attend.  Accordingly, the meeting's Outlook calendar item—with the attachment containing the deal's material terms— appeared in the Executive Assistant's Outlook calendar.

90.     Teixeira accessed this material nonpublic information from the Executive Assistant's laptop without her or the Investment Bank's permission to do so and shared it with Individual 1.

14

91.     Individual 1 then provided this material nonpublic information to Meadow, who in turn shared it with Smith, including that the information was misappropriated.

92.     Meadow began purchasing VMWare stock on or about May 9, 2022, as well as call option contracts beginning on May 10, 2022.

93.     VMWare's stock was trading at about $98 per share on May 10, 2022.

94.     On May 10, 2022, Smith caused Individual 2's account to purchase 50 VMWare call option contracts with a strike price of $125 and an expiration date of June 17, 2022.

95.     Later on May 10, 2022, Smith accessed several online articles about VMWare.

96.     The next day, May 11, 2022, Smith purchased 100 VMWare call option contracts with an expiration date of June 3, 2022 and a strike price of $115 in his own account.

97.     Meadow continued to trade VMWare securities through the next week.  By the close of business on May 18, 2022, Meadow held 1,000 shares of VMWare stock, 50 call option contracts with a strike price of $110 and an expiration date of June 17, 2022, and 50 call option contracts with a strike price of $110 and an expiration date of July 15, 2022.

98.     Company A did not purchase VMWare.  However, Broadcom subsequently began exploring a similar transaction with VMWare.

99.     On Friday, May 20, 2022, VMWare stock closed at $95.71 per share.

100.    On Sunday, May 22, 2022, Bloomberg publicly reported Broadcom's interest in VMWare.

101.    The next day, VMWare opened at $113.31 per share and closed at $119.43 per share, an approximately 24% increase from the May 20, 2022 closing price.

102.    On May 23, 2022, Smith used an IP address in Stamford, Connecticut to access his brokerage account.  The same IP address was used to access Individual 2's brokerage account

on May 23rd as well.  That day, Smith sold all the VMWare option contracts in his account and caused all but five of the VMware call option contracts in Individual 2's brokerage account to be sold.

103.    Smith caused the remaining five VMWare call option contracts in Individual 2's account to be sold on June 10, 2022.

104.    Smith realized profits of over $47,000 trading VMWare securities in his brokerage account, in addition to over $10,600 of profits generated in Individual 2's brokerage account.

105.    Between May 23, 2022 and June 1, 2022, Meadow sold his VMWare holdings, obtaining illicit profits of $93,057.

## VII.    Smith Violated Federal Securities Laws

106.    The Investment Bank's information concerning impending transactions involving, among others, Score and VMWare was material and nonpublic.  A reasonable investor would have viewed this information as important to his or her investment decisions and as significantly altering the total mix of information available to the public.

107.    Teixeira owed a duty of trust or confidence to the Executive Assistant by virtue of their relationship.

108.    Smith knew, was reckless in not knowing, or consciously avoided knowing that the information he obtained from Teixeira and Individual 1 through Meadow was material and nonpublic.

109.    Smith further knew, recklessly disregarded, or consciously avoided knowing that this material nonpublic information, including concerning the Score and VMWare transactions

referenced above, was obtained and conveyed in breach of a relationship of trust and confidence, or similar breach of a duty.

110. Smith nevertheless traded in and caused Individual 2's account to trade in, among others, Score and VMWare securities while aware and on the basis of the material nonpublic information he obtained, directly or indirectly, from Meadow, Individual 1 and Teixeira, which he knew was misappropriated.

111. Smith also caused his brokerage customers, as well as those he shared with Meadow, to trade in Score securities on the basis of material nonpublic information, which he knew was misappropriated.

## **CLAIM FOR RELIEF**

### **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

112. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 111, inclusive, as if they were fully set forth herein.

113. By engaging in the conduct described above, Smith, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

  a.   employed devices, schemes, or artifices to defraud;

  b.   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

114.    By reason of the foregoing, Smith violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently restraining and enjoining Defendant from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser pursuant to Sections 21(d)(1) and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) & (5)];

### III.

Ordering Defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), (5) & (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) & (7)];

**IV.**

Ordering Defendant to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**V.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated:   March 30, 2026

SECURITIES AND EXCHANGE COMMISSION

BY: S/Kara F. Sweet
Joseph G. Sansone
Scott A. Thompson
Gregory R. Bockin*
Julia C. Green
Norman P. Ostrove
Kara F. Sweet (KS0114)
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(215) 597-3100
(215) 597-2740 (fax)
SansoneJ@sec.gov
ThompsonS@sec.gov
BockinG@sec.gov
GreenJu@sec.gov
OstroveN@sec.gov
SweetK@sec.gov

*Pending admission *pro hac vice*
